IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

THERESA FARRELL,          )
                          )
        Plaintiff,        )
                          )
                          )   CIV-13-104-HE
v.                        )
                          )
CAROLYN W. COLVIN,        )
  Acting Commissioner of Social )
  Security Administration, )
                          )
        Defendant.        )

REPORT AND RECOMMENDATION

Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of Defendant Commissioner denying her applications for disability insurance and supplemental security income benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1382. Defendant has answered the Complaint and filed the administrative record (hereinafter TR___), and the parties have briefed the issues. The matter has been referred to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B). For the following reasons, it is recommended that the Commissioner's decision be reversed and remanded for further administrative proceedings.

I. Background

Plaintiff protectively filed her Title II application on April 6, 2009, and she filed her Title XVI application on April 20, 2009. (TR 241-242, 248-249). In her applications,

Plaintiff alleged that she was disabled beginning July 2, 2008, due to post-traumatic stress disorder ("PTSD"), bipolar disorder, previous stroke, previous aneurysm, and diabetes. (TR 325). She alleged that she quit working on July 2, 2008, because she could not "handle the stress" and that she did not return to work after that date because of her mental condition. (TR 325).

The record reflects that Plaintiff has been treated beginning in August 2006 for bipolar disorder and PTSD at Hope Community Services, Inc. ("Hope"). (TR 668-671). In her initial interview, Plaintiff described a history of illegal substance use, including crack cocaine, a recent suicide attempt, and feeling "as if she is on a roller coaster with her emotions." (TR 670-671). In an initial psychiatric evaluation, Dr. Al-Khouri noted that Plaintiff was going through a divorce and she reported her husband had been mentally and physically abusive. (TR 668). Dr. Al-Khouri's diagnostic impression was bipolar disorder I, most recent episode depressed, and PTSD. (TR 668). He prescribed anti-depressant, mood stabilizer, insomnia, and anti-anxiety medications for Plaintiff and recommended she return in four months for follow-up treatment. (TR 669).

In April 2007, Plaintiff returned to Dr. Al-Khouri. (TR 665). Dr. Al-Khouri adjusted her mood stabilizing medication and later adjusted her medication again. (TR 665). Plaintiff reported improvement in her mood swings. (TR 663). In November 2007, Plaintiff reported she had begun a new job and requested to return to the initial mood-stabilizing medication, and Dr. Al-Khouri adjusted her medication again. (TR 662).

In April 2008, Plaintiff underwent a psychological evaluation conducted by Dr. Rodgers in connection with a previous disability application. (TR 708-711). During this

evaluation, Plaintiff stated that she felt "ok" when she took her prescribed medications. (TR 708). She reported a history of medication noncompliance, improving concentration and moods with medication, and previous arrests for assault and battery, resisting arrest, public intoxication, and possession of marijuana on two occasions.

Dr. Rodgers reported that a mental status examination of Plaintiff was unremarkable, that she was not currently experiencing depression, and that her symptoms were controlled with medication. (TR 709). Dr. Rodgers reported that Plaintiff had anxiety disorder, that she continued to have PTSD symptoms but no longer met the criteria for PTSD, that she denied many of the symptoms of bipolar disorder, and that her symptoms were more consistent with personality disorder. Plaintiff had "poor coping abilities," but in Dr. Rodgers' opinion she was capable of understanding, remembering, and carrying out simple instructions in a work-related environment. (TR 709-710).

In July 2008, Plaintiff filed a claim for unemployment benefits and stated on the application that she had no condition limiting her ability to work and could begin working immediately. (TR 302-304). Later, she admitted to the unemployment agency that she had quit her job without telling her employer because "gas was too expensive to drive the distance to work." (TR 296, 319). The claim was denied.

In November 2008, Plaintiff reported at Hope that she had run out of her medications two months earlier. (TR 655). Plaintiff again reported in January 2009 that she had stopped taking her medications and was feeling more depressed. (TR 652). Plaintiff was prescribed anti-depressant, anxiety, and insomnia medications at Hope. (TR

3

652. In February 2009 Plaintiff requested a reduction in her anti-depressant medication, and she reported she was "doing ok." (TR 649).

Plaintiff was treated by Dr. Beringer in March 2009 for a subarachnoid hemorrhage due to a ruptured right posterior communicating artery aneurysm. (TR 668-669, 670-671). On March 13, 2009, Plaintiff underwent successful endovascular coiling to treat her aneurysm. (TR 473-475). She was discharged on March 24, 2009. (TR 514-515).

On March 27, 2009, Plaintiff was treated by Dr. Tyndall for a stroke. (TR 503-505). In a discharge summary dated April 2, 2009, Dr. Tyndall stated that Plaintiff was hospitalized and treated with medications. (TR 501). She was prescribed medication for Type II diabetes diagnosed by laboratory testing. Plaintiff was discharged in a stable condition with no medications other than recommended aspirin therapy. (TR 501).

In April 2009, Plaintiff sought treatment at a medical clinic where she complained of weakness in two fingers of her left hand. (TR 784). Plaintiff was prescribed medications for diabetes, insomnia, and high cholesterol. She was also prescribed anti-depressant and muscle relaxant medications. In June 2009, Plaintiff reported she was feeling depressed but she had run out of her anti-depressant medication. (TR 782).

In August 2009, Plaintiff underwent a consultative physical examination conducted by Dr. James Metcalf. Dr. Metcalf reported that Plaintiff described some lack of coordination and weakness in her left hand as a result of her previous intercerebral bleed and stroke, difficulty with memory, episodes of orthostatic hypotension, and "PTSD/bipolar disorder secondary to a 23-year abusive marriage." (TR 518). Dr. Metcalf

4

noted that Plaintiff exhibited no cognitive or thought disorder and did not appear to be acutely or chronically ill. In a physical examination, Plaintiff's spine, right shoulder, and hips had some limited range of motion and she had adequate dexterity and grip strength in both hands. (TR 519). She walked with a normal gait and could heel, toe, and tandem walk without difficulty. The clinical impression was status-post brain aneurysm and stroke, with resulting weakness in her left upper extremity, hypertension, diabetes, chronic low back pain, and PTSD/bipolar disorder. (TR 520).

In September 2009, Plaintiff's treating registered nurse practitioner noted that Plaintiff's blood sugar levels were well controlled on medication. (TR 780). In December 2009, Plaintiff underwent a psychological evaluation conducted by Dr. Kara Rodgers, Psy.D., who reported that Plaintiff walked "with no evident difficulties," her affect was euthymic, she was "extremely negative and often made hopeless statements during the interview," and she reported a history of attempted suicide, anxiety, irritability, and panic attacks. (TR 591). Dr. Rodgers noted that a mental status examination of Plaintiff was "unremarkable" and that she demonstrated good concentration, memory, abstract reasoning, and social judgment. (TR 592). Dr. Rodgers reported a diagnostic impression of major depressive disorder, severe and generalized anxiety disorder with possible PTSD, and possible borderline personality disorder. (TR 592).

Plaintiff's treating clinic continued her medications in May 2010. (TR 772). In June 2010 Plaintiff reported swelling in her extremities, and Plaintiff was prescribed medication for edema. (TR 770). In July 2010, Plaintiff complained of shortness of breath

5

with mild exertion. She was referred to a cardiologist. She reported her leg edema was improved. (TR 766).

Plaintiff returned to her treating clinic in August 2010 for diabetes follow-up. (TR 764). She was prescribed blood pressure medication in January 2011, and in April 2011 her treating nurse noted her blood pressure was improved and she exhibited no edema. (TR 756, 758).

In May 2011, Plaintiff reported to Dr. Al-Khouri that she was "doing ok." (TR 803). In a Psychiatric Review Technique form dated January 14, 2010, agency medical consultant Dr. Tom Shadid, Ph.D., opined that Plaintiff's mental impairments of affective disorder, anxiety-related disorder, and personality disorder had resulted in "moderate" functional limitations and no extended episodes of decompensation. (TR 595-608). In a Mental Residual Functional Capacity ("RFC") Assessment dated January 14, 2010, Dr. Shadid opined that Plaintiff was markedly limited in her abilities to understand, remember, and carry out detailed instructions and markedly limited in her ability to interact appropriately with the general public. (TR 609-610). Nevertheless, Dr. Shadid stated that Plaintiff could "understand, remember and carry out simple tasks. She can interact with others on a superficial level, but not the general public. She can adapt to a work situation." (TR 611). Dr. Janice Smith, Ph.D., stated in a report dated April 2, 2010, that she had reviewed all of the medical evidence and the mental RFC assessment of January 14, 2010, and "affirmed [the assessment] as written." (TR 637).

In a Physical RFC Assessment dated January 14, 2010, Dr. Kenneth Wainner, M.D., opined that despite her physical impairments Plaintiff was capable of occasionally

lifting 20 pounds, frequently lifting 10 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and occasionally stoop. (TR 614-615). Dr. Wainner provided reasons for the opinion drawn from the medical record.

In an administrative hearing conducted on January 25, 2011, before Administrative Law Judge McLean ("ALJ") (TR 107-158), Plaintiff testified she was 41 years old, completed the eighth grade, and previously worked as a cashier, cook, food preparer, shift manager, assistant manager, general manager, and expediter. Plaintiff testified that she had some loss of strength in her left hand and arm and her "equilibrium is [off] a lot" due to her aneurysm and stroke. Plaintiff stated she had back pain daily for which she took muscle relaxant medication, constant numbness and coldness in her feet, neck pain with loss of range of motion due to arthritis, headaches every day temporarily relieved by over-the-counter medication, numbness in her arms and shoulders, and knee problems caused by degenerative joint disease.

She estimated she could sit for 30 minutes, stand for five minutes with assistance, lift 12 ounces, and walk half a block, and she was unable to kneel, crouch, or crawl because of knee pain and dizziness. Plaintiff stated she was depressed, had no energy, and preferred to sit in her house and "be quiet and left alone." (TR 139). She testified she weighed 289 pounds and that she did not have a very good appetite although her weight had recently increased. She had difficulty concentrating because her mind raced and she forgot what she was doing. She had suicidal thoughts, she was angry most of the time, and stress caused her to shake and get upset. She had a previous assault and battery

7

charge because she "went after [her former husband's] car with [her] car." (TR 148). A vocational expert ("VE") also testified at the hearing.

II. ALJ's Decision

The ALJ found that Plaintiff had not engaged in substantial gainful activity since July 2, 2008, the date on which she alleged her disability began. Following the agency's well-established sequential evaluation procedure, the ALJ found at step two that Plaintiff had severe impairments due to status post stroke, diabetes, mellitus, obesity, bipolar disorder, major depressive disorder, anxiety disorder, and PTSD. (TR 86).

Giving special consideration to the agency's listings for neurological, endocrine, and mental impairments, as well as Social Security Ruling 02-1p for evaluating obesity impairments, the ALJ found at step three that Plaintiff's impairments did not meet or equal the requirements of a listed impairment deemed disabling *per se*. At step four, the ALJ extensively reviewed the medical and non-medical evidence and found that Plaintiff had the RFC to perform a limited range of sedentary work. Specifically, the ALJ found that Plaintiff could lift and/or carry 10 pounds occasionally and less than 10 pounds frequently, sit for about 6 hours in an 8-hour workday, stand and/or walk about 2 hours in an 8-hour workday, occasionally climb stairs and ramps, stoop, kneel, crouch, or crawl, never climb ladders, ropes, or scaffolds, or balance, understand, remember, and carry out simple tasks with routine supervision, respond appropriately to supervisors and co-workers for work purposes but not have public contact, and adapt to usual work situations.

The ALJ found that this RFC for work precluded the performance of any of Plaintiff's previous jobs as a fast food cook, food prep worker, fast food worker, assistant fast food manager, and cashier/checker. Reaching the fifth and final step of the sequential procedure, the ALJ found that Plaintiff was 39 years old at the time she alleged her disability began and she had a limited education.

Relying on the VE's testimony concerning the availability of jobs for an individual with Plaintiff's RFC for work, the ALJ concluded that based on Plaintiff's age, education, work experience, and RFC for work, there were jobs existing in significant numbers in the national economy that she could perform, including the representative occupations of document preparer, cutter/paster of press clippings, and film touchup inspector. In light of these findings, the ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act.

The Appeals Council denied Plaintiff's request for review, and therefore the ALJ's decision is the final decision of the Commissioner.[1] See 20 C.F.R. §§ 404.981, 416.1481; Wall v. Astrue, 561 F.3d 1048, 1051 (10th Cir. 2009).

III. Standard of Review

In this case, judicial review of the final Commissioner's decision is limited to a determination of whether the ALJ's factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. Wilson v. Astrue, 602

---

[1] The Appeals Council declined to review medical records submitted by Plaintiff that concerned medical treatment of Plaintiff occurring after the date of the ALJ's decision. (TR 4).

F.3d 1136, 1140 (10th Cir. 2010); Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance." Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007). The "determination of whether the ALJ's ruling is supported by substantial evidence must be based upon the record taken as a whole. Consequently, [the Court must] remain mindful that evidence is not substantial if it is overwhelmed by other evidence in the record." Wall, 561 F.3d at 1052 (citations, internal quotation marks, and brackets omitted).

IV. Evaluation of Records of Treating Psychiatrist and Consultative Examiner's Opinion

Plaintiff asserts that the ALJ also erred in failing to express what weight was given to the opinions of Plaintiff's treating psychiatrist, Dr. Al-Khouri. However, Plaintiff does not point to any particular opinion by Dr. Al-Khouri appearing in the record. The ALJ's decision reflects consideration of Plaintiff's treatment records with Dr. Al-Khouri. These records indicate that Dr. Al-Khouri prescribed psychotropic medications for Plaintiff and occasionally noted her subjective statements. (TR 638-641, 664-667, 733-735, 739-750). The ALJ's decision reflects consideration of Dr. Al-Khouri's treatment records, and the ALJ did not err in failing to express what weight was given to Dr. Al-Khouri's treatment records as no medical opinions are contained in the treatment records.

Plaintiff contends that the ALJ erred by failing to express what weight was given to the opinion of a consultative examiner, Dr. Kara Rodgers, Psy.D., contained in the report of a psychological evaluation of Plaintiff conducted in December 2009. Plaintiff refers to the statement of Dr. Rodgers in her report that Plaintiff was "functioning poorly

10

on a psychological basis. She seems to suffer from a severe depression as well as anxiety. She also appears to have very little coping abilities to manage her symptoms at this time. . . . It seems that she has significant difficulty controlling her anger and is likely unable to appropriately interact with others in any type of social environment." (TR 592).

Plaintiff argues that this statement is inconsistent with the ALJ's findings that Plaintiff's mental impairments had resulted in moderate limitations in activities of daily living, moderate limitations in social functioning, and moderate limitations in maintaining concentration, persistence or pace.

In the ALJ's decision, the ALJ summarized Dr. Rodgers' report of her December 2009 psychological evaluation of Plaintiff, including the foregoing statement. (TR 95-96). The ALJ found, consistent with Dr. Rodgers' report, that Plaintiff had severe impairments due to depressive disorder and anxiety disorder as well as mental impairments due to bipolar disorder and PTSD.

The ALJ did not, however, indicate what weight was given to Dr. Rodgers' opinion that Plaintiff was "likely unable to appropriately interact with others in any type of social environment." (TR 592).

In assessing Plaintiff's functional limitations at step two of the sequential evaluation procedure, the ALJ stated that Plaintiff had "moderate" limitations in social functioning. (TR 88). As reasons for this finding that ALJ noted that Plaintiff "visits with others and talks on the phone every day." (TR 88). The ALJ also noted that Plaintiff "has lunch with her mother once a week." (TR 88). The remainder of the reasoning is difficult

11

to square with the finding of "moderate" social functioning limitations. The ALJ noted that Plaintiff was "very irritable and may start screaming or yelling at someone over an incidental thing. She prefers to be left alone. She testified she has anger issues and does not get along with people." (TR 88).

Moreover, these last comments are consistent with Dr. Rodgers' opinion that Plaintiff would likely be unable to appropriately interact with other people in any social environment. In assessing Plaintiff's RFC for work at step four, the ALJ found that Plaintiff could "respond appropriately to supervisors and co-workers for work purposes, but cannot have public contact." (TR 89). This finding is not consistent with Dr. Rodgers' opinion, and the ALJ's failure to address the opinion is error. The Commissioner argues that (1) the ALJ considered other aspects of Dr. Rodgers' report and (2) a state agency psychological consultant, Dr. Shadid, expressed consideration of Dr. Rodgers' report in a Psychiatric Review Technique form completed by the consultant. But neither of these arguments mitigate the ALJ's error in any way. In particular, Dr. Shadid's Psychiatric Review Technique form does not address the particular opinion by Dr. Rodgers concerning Plaintiff's social functioning limitations and, in any event, a state agency consultant cannot perform the necessary analysis of a relevant examining doctor's opinion FOR the ALJ.

In view of this error it is not necessary to consider Plaintiff's remaining arguments. However, it is worthwhile to briefly address Plaintiff's remaining claims of legal error. With regard to Plaintiff's argument that the ALJ erred in failing to expressly consider a Global Assessment of Functioning ("GAF") score of 45 assessed by Dr. Al-Khouri in

August 2006, the ALJ did not err in failing to expressly consider Dr. Al-Khouri's remote, one-time, low GAF score. See Lee v. Barnhart, 117 Fed.Appx. 674, 678 (10th Cir. 2004)(unpublished op.)("Standing alone, a low GAF score does not necessarily evidence an impairment seriously interfering with a claimant's ability to work."). With regard to Plaintiff's argument that the ALJ erred in failing to expressly consider a GAF score assessed by Dr. Rodgers, the ALJ considered the GAF score of 44 assessed by the consultative psychological examiner, Dr. Rodgers, in December 2009 (TR 95-96), and the ALJ gave a valid reason for discounting the low GAF score.[2] See Luttrell v. Astrue, 453 Fed.Appx. 785, 791 n. 4 (10th Cir. 2011)(recognizing the court had "repeatedly noted . . . that generalized GAF scores, which do not specify particular work-related limitations, may be helpful in arriving at an RFC but are 'not essential to the RFC's accuracy'")(quoting, e.g., Butler v. Astrue, 412 Fed.Appx. 144, 147 (10th Cir. 2011), and Holcomb v. Astrue, 389 Fed.Appx. 757, 759 (10th Cir. 2010)).

With regard to Plaintiff's argument, relying on Social Security Ruling 06-3p, that the ALJ erred by not expressly considering the statements of Plaintiff's mother, Ms. Bishop, concerning Plaintiff's mental impairments, no error occurred, and even if error occurred it is harmless.

The agency's regulations distinguish between opinions from "acceptable medical sources," who are defined as licensed physicians, psychologists, podiatrists, and qualified

---

[2]The ALJ quoted the American Psychological Association's Diagnostic and Statistical Manual in reasoning that the GAF "is not intended for forensic purposes, such as an assessment of disability or competency or the individual's control over such behavior." (TR 96).

speech-language pathologists, and other health care providers who are not "acceptable medical sources." 20 C.F.R. §§ 416.913(a), (d)(1). The regulations further provide that adjudicators may consider information from other "non-medical sources." For instance, adjudicators "may . . . use evidence from other sources to show the severity of [a claimant's] impairment(s) and how it affects [the claimant's] ability to work. . . . Other sources include . . . (4) [o]ther non-medical sources (for example, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy)." 20 C.F.R. §416.913(d)(4).

SSR 06-3p "clarifies how [the Commissioner] consider[s] opinions and other evidence from medical sources who are not 'acceptable medical sources.'" SSR 06-3p, 2006 WL 2329939, at *4. The agency states in the ruling that the clarification is necessary because

> [w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources ... are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

Id. at *3.

To effectively further this policy, the agency advised that "[a]djudicators generally should explain the weight given to opinions from these 'other sources,' or otherwise

ensure that the discussion of the evidence ... allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." Id. at *6.

The ruling briefly states that

> '[n]on-medical sources' who have had contact with the individual in their professional capacity, such as teachers, school counselors, and social welfare agency personnel who are not health care providers, are also valuable sources of evidence for assessing impairment severity and functioning. Often, these sources have close contact with the individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time. Consistent with [the regulations], we also consider evidence provided by other 'non-medical sources' such as spouses, other relatives, friends, employers, and neighbors.

Id. at *3. The ruling specifically advises that "[s]ince there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not 'acceptable medical sources' and from 'non-medical sources' who have seen the claimant in their professional capacity." Id. at * 6.

Because "all the ALJ's required findings must be supported by substantial evidence," Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999), the ALJ must "discuss[ ] the evidence supporting [the] decision" and must also "discuss the uncontroverted evidence [the ALJ] chooses not to rely upon, as well as significantly probative evidence [the ALJ] rejects." Clifton v. Chater, 79 F.3d 1007, 1010 (10th Cir. 1995).

In May 2009, Plaintiff's mother completed a third-party function report in which she stated that Plaintiff "has trooble [sic] with motor skills and memory," was easily distracted and irritable, but she visited with others daily, shopped for groceries twice a week, attended her doctor's appointments, watched television "all day," and handled changes in routine "pretty good," although she had a "hard time finishing up things like paperwork and books." (TR 490-496). Ms. Bishop's statements were conclusory and vague. Plaintiff has not shown that Ms. Bishop provided significantly probative evidence or that her statements were uncontroverted. Thus, even if the ALJ erred in failing to expressly consider Ms. Bishop's third-party function report, the error is harmless.

Plaintiff's remaining claim is that the ALJ's RFC finding is not supported by substantial evidence in the record. Because this matter is more appropriate for determination on remand in light of the related legal error found above, the issue need not be addressed.

RECOMMENDATION

In view of the foregoing findings, it is recommended that judgment enter REVERSING the decision of the Commissioner to deny Plaintiff's applications for benefits. The parties are advised of their respective right to file an objection to this Report and Recommendation with the Clerk of this Court on or before      January 9th , 2014, in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 72. The failure to timely object to this Report and Recommendation would waive appellate review of the recommended ruling. Moore v. United States, 950 F.2d 656 (10th Cir. 1991); cf. Marshall

v. Chater, 75 F.3d 1421, 1426 (10th Cir. 1996)("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived.").

This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter, and any pending motion not specifically addressed herein is denied.

ENTERED this    20th    day of    December   , 2013.

GARY M. PURCELL
UNITED STATES MAGISTRATE JUDGE